## S. S. KRESGE CO. v. UNITED STATES

**No. 8127.—**

Entry No. 816484, etc.

(Decided June 9, 1952)

*Sharretts, Hillis & Paley* (*Howard C. Carter* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Daniel I. Auster*, special attorney), for the defendant.

LAWRENCE, Judge: The five appeals for reappraisement enumerated in schedule "A" attached to and forming part of the decision herein were consolidated for hearing and determination.

These appeals relate to celluloid-covered thumb tacks, 50 pieces mounted on each board. Appeal 125792–A also includes certain glass cocktail sippers concerning which there is presently no contest inasmuch as the parties litigant have stipulated and agreed "that the appraised value of the cocktail sippers marked 'A' * * * less the additions made by the importer on entry because of advances by the appraiser in similar cases, is equal to the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities in the ordinary course of trade, for exportation to the United States, and that the foreign value of such or similar merchandise is no higher."

With regard to the glass cocktail sippers covered by said reappraisement appeal 125792–A, it was agreed between the parties litigant that the export value of said merchandise, as defined in section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)), is equal to the appraised value, less additions made by the importer because of advances by the appraiser in similar cases, and that there is no higher foreign value (section 402 (c) of said act (19 U. S. C. § 1402 (c))).

Accordingly, said appeal is sustained as to the glass cocktail sippers. The valuation of the celluloid-covered thumb tacks involved in said appeal 125792–A will be considered along with those in the other four appeals.

With respect to the thumb tacks, the United States appraiser made a report as required by section 202 (a) of the Antidumping Act of 1921 (19 U. S. C. §§ 160–171) pursuant to the finding of dumping of such merchandise from Germany (section 201 (a) of said act) which was proclaimed by the Secretary of the Treasury, September 12, 1933 (64 Treas. Dec. 216, T. D. 46615). It may be noted that this proclamation was revoked August 29, 1940, 76 Treas. Dec. 87, T. D. 50234.

It is the contention of plaintiff that the provisions of the Antidumping Act, *supra*, do not properly apply to the thumb tacks in controversy, asserting that the purchase price is not less than the foreign market value. (Section 202 (a), *supra*.)

### THE STATUTES

The provisions of the Antidumping Act, *supra*, so far as applicable here, read:

#### DUMPING INVESTIGATION

SEC. 201. (a) That whenever the Secretary of the Treasury (hereinafter in this Act called the "Secretary"), after such investigation as he deems necessary, finds that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.

#### SPECIAL DUMPING DUTY

SEC. 202. (a) That in the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary has made public a finding as provided in section 201, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the cost of production) there shall be levied, collected, and paid, in addition to the duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

#### PURCHASE PRICE

SEC. 203. That for the purposes of this title, the purchase price of imported merchandise shall be the price at which such merchandise has been purchased or agreed to be purchased, prior to the time of exportation, by the person by whom or for whose account the merchandise is imported, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and plus the amount, if not included in such price, of any export tax imposed by the country of exportation on the exportation of the merchandise to the United States; and plus the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States; and plus the amount of any taxes imposed in the country of exportation upon the manufacturer, producer, or seller, in respect to the manufacture, production or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

FOREIGN MARKET VALUE

SEC. 205. That for the purposes of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

At the trial plaintiff introduced the affidavit of Dr. Erich Karrenberg which was received in evidence as exhibit 1. It should be noted here that while Dr. Karrenberg in this affidavit refers in several instances to thumb tacks with "cellophane"-covered heads, it appears from a subsequent affidavit of Dr. Karrenberg, dated August 2, 1950, received in evidence as exhibit 7, that the use of the word "cellophane" in exhibit 1 was inadvertent; that deponent in said affidavit exhibit 1 intended to say "celluloid"-covered heads. In exhibit 7, Dr. Karrenberg further declares "That thumb tacks with cellophane covered heads were never at any time manufactured by Gust. Rafflenbeul" (the manufacturer of the thumb tacks in controversy) and, to the best of deponent's knowledge and belief, were never at any time manufactured anywhere in Germany.

In view of the materiality and importance of Dr. Karrenberg's affidavit (exhibit 1), it is set out in full, it being understood that the word "cellophane" should read "celluloid":

City of Schwelm
State of Northrhine-Westphalia
Germany
Erich Karrenberg, duly sworn, says

1. That he is General Manager of HANSA-WERK Ernst Berning, Wuppertal-Barmen, Germany, and has been with such firm from its start 1943.

2. That in the year of 1943 the firm of HANSA-WERK Ernst Berning, Wuppertal-Barmen, has been formed as a separate concern, taking over the assets, liabilities, equipment, and personnel of the metal small-ware department of Rafflenbeul, and that he has been General Manager of said division of Rafflenbeul for the past 20 years.

3. That as General Manager of said company, he is thoroughly familiar with the manufacture and sale of steel wire thumb tacks with cellophane covered heads, 50 pieces mounted on each board, which were manufactured by said company under his personal supervision during the year 1938.

4. That he is personally familiar with the sale of all kinds of thumb tacks in Germany, both for consumption in Germany and for exportation to the United States and other countries and that he knows from personal experience the ordinary course of wholesale dealings, the principal markets of Germany for the sale of all kinds of thumb tacks and the numbers of sales and quantities involved therein, and the price at which such sales were made.

5. That steel wire thumb tacks with cellophane covered heads, 50 pieces mounted on each board, were never at any time sold in Germany for consumption in Germany.

6. That steel wire thumb tacks with cellophane covered heads, 50 pieces mounted on each board, were freely offered for sale and were at all times during this period freely offered for sale in the usual course of trade to all purchasers for exportation to the United States and to other countries.

7. That the principal markets of Germany for the sale of such thumb tacks for exportation to the United States and to other countries were Sonneberg, Berlin and Hamburg.

8. That the vast majority of sales at wholesale of such thumb tacks for exportation to the United States and to other countries were in quantities of thousand gross boards and more.

9. That the price at which said thumb tacks were freely offered for sale and were sold to all purchasers for exportation to the United States and to other countries in quantities of thousand gross boards and more in Sonneberg, Berlin and Hamburg, in the usual course of trade, was RM 8.85 per gross boards, less 3%, packing included.

10. That the price of RM 8.85 per gross boards, less 3%, packing included, was, in fact, the actual price paid by the S. S. Kresge Co. and was the amount received by Gust. Rafflenbeul for said thumb tacks.

11. That there is no export tax imposed by Germany on the exportation of said thumb tacks.

12. That no import duties have been rebated or not collected because of the exportation of said thumb tacks to the United States.

13. That no taxes were imposed on Gust. Rafflenbeul or any other person or company by reason of the manufacture, production or sale of the said thumb tacks, nor have any taxes been rebated or not collected, by reason of the exportation of said merchandise to the United States.

14. That the cost of all materials, fabrication, manipulation and other processes employed in manufacturing identical merchandise at all times preceding the dates of shipment, plus usual general expenses of more than 10% of the cost of materials, fabrication, manipulation and other processes of manufacture, plus the cost of all containers and coverings and all other costs, charges and expenses incident to placing the said thumb tacks in condition, packed ready for shipment to the United States, plus a profit of more than 8% of the sum of the cost of materials, fabrication as aforesaid, and the usual general expenses, as aforesaid (said profit being at least equal to that which is ordinarily added by other manufacturers of thumb tacks in Germany) is less than RM 8.85 per gross boards, less 3%, packing included.

The affidavit (exhibit 1) was sworn to before a German notary public whose authority to act as such was duly certified by a consul of the United States then located in the city of Bremen, Germany. Upon the foregoing evidence, plaintiff rested its case.

Defendant then introduced the following documentary exhibits:

Exhibit 2, report of Treasury Representative Charles Kruszewski, file 288/37, dated December 30, 1937.

Exhibit 3, report of Treasury Representative Charles Kruszewski, file 158/36, dated July 20, 1936.

Exhibit 4, report of Treasury Attaché Erwin G. May, file 158/36-B, dated April 28, 1937.

Exhibit 5, report of Treasury Representative Charles Kruszewski, file 288/38-A, dated September 29, 1938.

Exhibit 6, report of Assistant Treasury Attaché Paul Hermes, file 6/35-B, dated March 22, 1935.

For easy reference, the following data are tabulated with reference to celluloid-covered thumb tacks, 50 pieces mounted on each board:

| Appeal numbers | Invoiced and entered value | Appraised value | Alleged F. M. V. on date of purchase date of shipment | Alleged unit purchase price |
|---|---|---|---|---|
| 125792–A/01523 | R. M. 8.85 less 3% per gross boards. | R. M. 8.66, packed per gross boards. | R. M. 8.66 per gross boards. | R. M. 8.55 per gross boards. |
| 139138–A/02737 | R. M. 8.85 less 3% per gross boards. | R. M. 8.85 less 3% per gross boards. | R. M. 60.14 per M. boards. | R. M. 59.60 per M. boards. |
| 139139–A/02738 | " | " | " | " |
| 139140–A/02739 | " | " | " | " |
| 139141–A/02740 | " | " | " | " |

It will be observed that—

R. M. 8.85 less 3% per gross boards equals R. M. 8.58 per gross boards
R. M. 8.66 per gross boards equals R. M. 60.14 per 1,000 boards
R. M. 8.55 " " " " R. M. 59.375 " " "
R. M. 8.58 " " " " R. M. 59.60 " " "

With respect to the celluloid-covered thumb tacks mounted on boards, plaintiff relies upon the affidavit (exhibit 1) of Dr. Karrenberg to support its contention. It is apparent from an examination of said affidavit that Dr. Karrenberg was well qualified to give the evidence contained therein. He recited his qualifications as general manager of HANSA-WERK since 1943, at which time said firm was formed and took over the assets, liabilities, equipment, and personnel of the metal small-ware department of Rafflenbeul (manufacturer and exporter of the tacks in controversy) of which he had been general manager "for the past 20 years," that he was thoroughly familiar with the manufacture and sale of steel wire thumb tacks with celluloid-covered heads, "50 pieces mounted on each board," which were manufactured by said company under his personal supervision during the year 1938 (the vital period here under consideration); that he was personally familiar with the sale of all kinds of thumb tacks in Ger-

many, both for consumption in Germany and for exportation to the United States and other countries; that he knew from personal experience the ordinary course of wholesale dealings, the principal markets of Germany for the sale of all kinds of thumb tacks, the number of sales, the quantities involved therein, and the price at which such sales were made.

Based upon his knowledge and experience, Dr. Karrenberg stated that steel wire thumb tacks with celluloid-covered heads, 50 pieces mounted on each board, were never at any time sold in Germany for consumption in Germany; that said tacks were freely offered for sale at all times during this period (1938) in the usual course of trade to all purchasers for exportation to the United States and *to other countries*; that the principal markets of Germany for the sale of such thumb tacks for exportation to the United States and to other countries were Sonneberg, Berlin, and Hamburg; that the vast majority of sales at wholesale of such thumb tacks for exportation to the United States and to other countries were "in quantities of thousand gross boards and more"; and that the price at which said thumb tacks were freely offered for sale and sold to all purchasers for exportation to the United States and to other countries in quantities of thousand gross boards and more in Sonneberg, Berlin, and Hamburg, in the usual course of trade was RM 8.85 per gross boards, less 3 per centum, packing included, which was, in fact, the actual price paid by the S. S. Kresge Co. (plaintiff herein) and was the amount received by Gust. Rafflenbeul for said thumb tacks.

Dr. Karrenberg further stated that no import duties had been rebated or not collected because of the exportation of said thumb tacks to the United States, and that no taxes were imposed on Gust. Rafflenbeul or any other person or company by reason of the manufacture, production, or sale of the said thumb tacks, nor have any taxes been rebated or not collected by reason of the exportation of said merchandise to the United States.

It may be noted in passing that Dr. Karrenberg furthermore attested to the cost of all materials, fabrication, manipulation, and other processes employed in manufacturing identical merchandise at all times preceding the dates of shipment, plus usual general expenses of more than 10 per centum of the cost of materials, fabrication, manipulation, and other processes of manufacture, plus other items incident to the establishment of cost of production defined in section 206 of the Antidumping Act, *supra*, which is less than RM 8.85 per gross boards, less 3 per centum, packing included.

While the statute (section 501 of the Tariff Act of 1930, as amended (now 28 U. S. C. § 2633)) provides that the value found by the appraiser shall be presumed to be the value of the merchandise, and the burden shall rest upon the party who challenges its correctness to prove otherwise, I am clearly of the opinion that the straightfor-

ward and positive statements of Dr. Karrenberg in exhibit 1 have overcome the presumption attaching to the appraiser's action. *United States* v. *F. W. Woolworth Co. et al.*, 22 C. C. P. A. 184, T. D. 47126. At this point, plaintiff had established that the importer's unit purchase price of the merchandise was the same as the entered unit value of RM 8.85, less 3 per centum, per gross boards. Section 205 of the Antidumping Act, *supra*, provides that if merchandise is not sold or offered for sale for home consumption, then in that event foreign market value may be established by proof of the price at which the merchandise is sold "for exportation to countries other than the United States." The affidavit of Dr. Karrenberg firmly establishes not only that the thumb tacks under consideration "were never at any time sold in Germany for consumption in Germany," but that the price at which said thumb tacks were freely offered for sale and sold to all purchasers for exportation to the United States "and to other countries" was RM 8.85 per gross boards, less 3 per centum, packing included. Moreover, this was the amount actually paid by the plaintiff and the amount received by the shipper for said thumb tacks. It may be noted in passing that defendant in its brief frankly admits that the affidavit (exhibit 1) indicates that "there were sales of such or similar merchandise for exportation to countries other than the United States."

In an effort to overcome the effect of the evidence introduced by plaintiff, defendant relies upon the material contained in certain reports of Treasury representatives which were offered in evidence. Although five of said reports were received as exhibits 2, 3, 4, 5, and 6, referred to earlier in this opinion, defendant in its brief relies primarily upon exhibit 2 with cursory references to exhibit 4 and exhibit 5. Exhibit 3, consisting of 10 pages, and exhibit 6, comprising 22 pages, are not discussed by defendant, and a careful examination of those exhibits would indicate that the reason for not doing so is due to the fact that those reports contain no substantial evidence bearing upon this controversy. Why they were put in evidence is not explained. When they were offered at the trial pursuant to the provisions of section 501, *supra*, it was naturally assumed that their contents were material and relevant to the issue.

Defendant relies upon an inland price list of the exporter referred to in exhibit 2, and quotes a price for celluloid-covered thumb tacks "On card boards with 50 tacks single colored or striped," size 2, of RM 93 per 1,000 card boards, as of April 1, *1936*, which was long prior to the exportation of the thumb tacks before the court.

Defendant also refers to page 6 of exhibit 4 and states that it "contains the exporter's price-list showing inland sales * * *." No prices are given on said page 6, however, but reference is made to a "price leaflet" accompanying said report "which shows German inland prices for various types of thumb tacks * * *." However,

since that leaflet is printed in a foreign language unaccompanied by an authentic translation, it is dismissed from consideration. I, therefore, regard exhibit 4 as having no evidentiary value, and I am of the opinion that there is no substantial competent evidence before me of offers for sale or sales of said thumb tacks to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for home consumption.

The only reference by defendant to exhibit 5 is a quotation from page 2 thereof as follows:

Director Dr. Karrenberg had readily available on his desk copy of association price list submitted as exhibit No. 1 to my report No. 288/37 dated December 30, 1937. [Court exhibit 2.] This list went into effect on April 1, 1936 and remained unchanged in effect since that date. * * * Thus the association so far did not change prices for domestic sales and the discounts and selling conditions also remained the same as reported in my report No. 288/37 dated December 30, 1937.

However, none of the sales listed in exhibit 5 was of celluloid-covered thumb tacks, 50 pieces mounted on a board, which form the subject of this controversy. On the contrary, they were thumb tacks packed in boxes.

All of the five exhibits introduced by defendant have received careful scrutiny, and I am satisfied that in none of them is there evidence of substantial quality to overcome the direct and positive proof contained in the affidavit (exhibit 1) of Dr. Karrenberg.

After carefully reviewing the record before me, I am clearly of the opinion that the weight of competent evidence establishes that there is no legal foundation for the assessment of an antidumping duty in this case; that the purchase price, as defined in section 203 of the Antidumping Act, *supra*, is not less than the statutory foreign market value, as defined in section 205 of said act, and while not necessary to a decision herein, I am also of the opinion, based upon the record before me, that the purchase price is not less than the cost of production, as defined in section 206 of said Antidumping Act (19 U. S. C. § 165).

Accordingly, I find as facts:

(1) That appeal 125792-A (in addition to the thumb tacks) relates to glass cocktail sippers entered under duress pursuant to the provisions of section 503 (b) of the Tariff Act of 1930 (19 U. S. C. § 1503 (b));

(2) That the market value or price at the time of the exportation of said cocktail sippers to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition,

packed ready for shipment to the United States, is the appraised value less the additions made by the importer on entry because of advances by the appraiser in similar cases;

(3) That said appeal 125792–A and the other four appeals for reappraisement herein embrace steel wire thumb tacks with celluloid-covered heads, 50 pieces mounted on each board, exported from Germany in the year 1938;

(4) That such merchandise was never offered for sale or sold in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade for home consumption;

(5) That during the year 1938, such merchandise was freely offered for sale in the usual course of trade to all purchasers for exportation to the United States and to other countries;

(6) That the principal markets of Germany for the sale of such merchandise for exportation to the United States and to other countries were Sonneberg, Berlin, and Hamburg;

(7) That the usual wholesale quantity in which such merchandise was sold at wholesale was 1,000 gross boards;

(8) That at the time of purchase and on the date of exportation, such merchandise was freely offered for sale and was sold to all purchasers in the principal markets of Germany, in the usual wholesale quantities in the ordinary course of trade, not only for exportation to the United States but to other countries as well, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, at RM 8.85 less 3 per centum per gross boards;

(9) That the price of RM 8.85 less 3 per centum per gross boards, was the actual price paid by the importer herein and was the amount received by the manufacturer;

(10) That the purchase price, as defined in section 203, Antidumping Act of 1921, *supra*, is the same as the foreign market value on the date of purchase, as defined in section 205, *supra*.

Therefore, as matter of law, I conclude:

(1) That the glass cocktail sippers, marked "A" and initialed "WRS" by Examiner W. R. Shapiro on the invoice covered by reappraisement appeal 125792–A, are properly dutiable on the basis of export value as that value is defined in section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)) and that there is no higher foreign value;

(2) That said export value is the appraised value less the additions made by the importer upon entry because of advances by the appraiser in similar cases;

(3) That the steel wire thumb tacks with celluloid-covered heads, 50 pieces mounted to each board, in the appeals enumerated in schedule

"A" attached to and forming part of this decision, are evaluated on the basis of the export value as defined in section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)); that said value is RM 8.85 less 3 per centum per gross boards; and that there is no higher foreign value.

(4) That the purchase price as defined in section 203 of the Antidumping Act of 1921 (19 U. S. C. § 162) is equal to the foreign market value on the date of purchase, as defined in section 205, *supra* (19 U. S. C. § 164).

Judgment will be entered accordingly.